**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CORDERROL PRIESTER, | : |
| Petitioner, | : Civil Action No. 17-786 (JMV) |
| v. | : **OPINION** |
| STEVEN JOHNSON, et al., | : |
| Respondents. | : |

**VAZQUEZ, District Judge:**

## I.   INTRODUCTION

Petitioner Corderrol Priester has submitted a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (DE 1.) Respondents have filed an Answer opposing habeas relief. (DE 8.) For the reasons set forth, the Petition is denied. A certificate of appealability shall not issue.

## II.   BACKGROUND

The conduct underlying Petitioner's criminal conviction was summarized by the New Jersey Superior Court, Appellate Division on Petitioner's direct appeal:[1]

> The record provides evidence that, on July 31, 2006 at approximately 2:00 a.m., defendant, wearing a do-rag over his face that left his chin exposed, along with two taller and darker-skinned persons wearing ski masks, accosted David Crawford outside of his house. After chasing him down, stripping off his pants and shoes, binding him up with duct tape, and hitting him on the side of the head, they forced him to give them entry into his house. Once in the house, they proceeded to a spare bedroom and then to the bedroom

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

of Crawford's mother, Kathleen Rabb, whom they also bound with duct tape and held at gunpoint. After ransacking the room, they eventually found a safe, which they emptied. Although the intruders also found a second safe in the spare bedroom, they were unable to gain access to its contents. Frustrated, they commenced hitting Crawford and threatening him and his mother that they would be shot if they did not relinquish the safe's combination, which neither recalled.

Thereafter, Crawford was brought to the basement by the two taller men, where the intruders found a third safe and, because they claimed that Crawford had lied about its existence, one of the men hit him again across the face. However, they seemed less interested in gaining access to this safe, and eventually returned with Crawford to the main floor. Throughout, the intruders demanded $75,000, which they apparently assumed to be in the house.

At some point, Crawford's girlfriend, Tyisha Brantley, who had been pistol-whipped across the temple, was brought into the room by the person who appeared to Crawford to be the leader of the three. However, when she requested to be permitted to go upstairs to Crawford's bedroom to attend to her baby, the leader threatened Crawford that if he did not give the men what they were looking for, the baby would be thrown down the stairs. When Crawford reacted to the threat, he was again hit on the back of his head. Thereafter, the baby was brought safely downstairs. However, eventually, Brantley was permitted to go to another room to lay the baby down. There, she was guarded at gunpoint by defendant.

Crawford was again taken to the basement, along with Rabb and Crawford's grandmother, Sarah Kee. All were ordered to sit on the couch, where they were threatened and held at gunpoint. After a period of time, one of the men turned on the television, with the volume very loud. The occupants of the basement were instructed to be quiet and not to move, and the intruders left the basement. When the noises overhead stopped, the family called the police.

The intruders spent a total of approximately three hours in the house. In addition to the jewelry stolen from the safe in Rabb's room, they took approximately $1,500 in cash that Crawford told them would be found in his car.

Defendant was initially identified by the police as a potential perpetrator approximately two weeks after the home invasion after jewelry stolen from the house was found in a local pawn shop and

> traced back to him. Thereafter, Crawford and his mother were asked to come to the police station to identify the jewelry, which they did.
>
> While at the police station, Crawford and Rabb were each shown a six-person photo array that contained the photograph of defendant. Rabb was unable to identify anyone in the array; Crawford identified defendant as similar to the intruder who held a gun on him and his baby, stating that he was fifty percent sure of the identification. Two days later, Crawford's girlfriend, Brantley, was shown a photo array, and she selected defendant from it, stating that she was ninety percent sure of the identification. Crawford and Brantley stated that they obtained a partial view of defendant's face through the do-rag, which was somewhat transparent, and they were able to observe his skin color, his neck, and wispy hairs on his chin, because his face was not completely covered.
>
> Both identifications were admitted in evidence at trial, along with in-court identifications by Crawford and Brantley. In that connection, Crawford testified that, while in a car with Rabb one week after the home invasion, he had seen a person on the street that he was "very certain" was the gunman. Crawford did not report the sighting to the police, and mentioned it for the first time shortly before trial two years later. Although Rabb had been unable to identify anyone in the photo array as one of the perpetrators, at trial she identified defendant as the man whom Crawford had identified a week after the home invasion.

(DE 8-8, at 5–8.)

Following a jury trial, Petitioner was found guilty of first-degree kidnapping, N.J.S. § 2C:13-1b; second-degree kidnapping, N.J.S. § 2C:13-1b; third-degree criminal restraint, N.J.S. § 2C:13-2; two counts of first-degree robbery, N.J.S. § 2C:15-1; two counts of second-degree burglary, N.J.S. § 2C:18-2; second-degree possession of a weapon for an unlawful purpose, N.J.S. § 2C:39-4a; third-degree unlawful possession of a weapon, N.J.S.§ 2C:39-3b; five counts of fourth-degree aggravated assault, N.J.S. § 2C:12-1b(4); and third-degree aggravated assault, N.J.S. § 2C:12-1b(2). (DE 8-8, at 1–2.) Petitioner was sentenced to an aggregate thirty-year term of imprisonment, subject to certain periods of parole ineligibility. (*See* DE 8-2.) Petitioner filed an appeal of his conviction and sentence to the Appellate Division, which was denied on July 18,

2012. (DE 8-8.) The New Jersey Supreme Court denied certification of Petitioner's direct appeal on January 31, 2013. (DE 8-13.)

On March 5, 2013, Petitioner filed a petition for post-conviction ("PCR Petition") relief in the New Jersey Superior Court. (DE 8-14.) On May 2, 2014, following oral argument, the Superior Court denied post-conviction relief. (DE 8-35.) Petitioner appealed that decision, and the Appellate Division affirmed the denial of the PCR Petition on December 30, 2015. (DE 8-22.) The New Jersey Supreme Court denied certification on the PCR Petition on September 12, 2016. (DE 8-26.)

On February 1, 2017, Petitioner filed the instant Petition pursuant to § 2254. (DE 1.) In the Petition, Petitioner raises four grounds for relief:

> Ground One: The Judge's Charge on Accomplice liability was Awkwardly Separated from the Substantive Charges, Inadequately Tailored to the facts of the case, and Failed to properly convey that an Accomplice could be Found Guilty of a Lesser Offense than the Principal.
>
> Ground Two: The Testimony that Crawford Spotted a Person on the Street whom He was Certain was the Gunman did not Qualify as a "Prior Identification" where there was no Evidence Direct or Circumstantial, that, the Man Crawford Spotted was the Petitioner, thus the Jury Should not have been Permitted to Consider the testimony as Proof that the Petitioner was the Gunman or as Corroboration for Crawford's In-Court Identification.
>
> Ground Three: The Admission of the Out-of-Court Identification of the Petitioner made by Crawford and Brantley, which were Impermissibly Suggestive and Insufficiently Reliable, Violated the Petitioner's Right to a Fair Trial and Due Process of Law.
>
> Ground Four: The Judge's Instructions Regarding the In-Court and Out-of-Court identifications were Misleading, as They Focused on Factors that were Irrelevant and failed to Mention Factors Critical to the Reliability of the Identification Evidence.

(*See id.*)

## III.     STANDARD OF REVIEW

Section 2254(a) permits the federal district courts to entertain claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts sitting in habeas review must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010). Thus, where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)(1)–(2)). The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 572 U.S. 415, 419 (2014) (first alteration in original) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012)). A decision is "contrary to" a Supreme Court holding for the purposes of § 2254(d)(1) "if the state court arrives at a conclusion opposition to that reached by th[e Supreme] Court on a question of law" and "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an [opposite result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

## IV. DISCUSSION

### a. Ground One

In Ground One, Petitioner asserts that the trial court's instruction to the jury on accomplice liability was erroneous because it (1) was separated from the jury charges on the underlying substantive offenses; (2) was not properly tailored to the facts of the case; and (3) failed to convey that an accomplice can be found guilty of a lesser offense than that committed by the principal. (DE 1-2, at 1.) Petitioner challenged the accomplice liability jury instructions on his direct appeal. (DE 8-8, at 8–9.) The Appellate Division found no error, explaining:

> Our review of the record discloses that the court first instructed the jury on each of the charges against defendant set forth in the indictment – a lengthy process, given the indictment's eighteen counts. The court then carefully instructed the jury that the State "maintains that the defendant is liable for each count of the indictment based on his own hand, his own conduct." But, the court continued, "[t]he State also maintains that he is responsible for the criminal conduct of the taller, masked perpetrators of the home invasion that occurred on July 31, 2006[.]" The court followed this statement with a legally accurate explanation of accomplice

6

> liability. Contrary to defendant's argument, that instruction was followed by a further instruction to the jury to consider whether defendant acted as an accomplice, but with a purpose to commit a lesser crime.
>
> Thus, we find that the court's charge was correct. We perceive no error in the fact that the legal basis for a finding of accomplice liability was charged after the elements of each charge against defendant were explained. Indeed, we find that organization to have been entirely proper, given the complexity of the charge required in this matter. And while the court did not include any discussion of trial evidence in the accomplice aspect of the charge, such facts were discussed elsewhere. Thus, no error occurred.

(*Id.* (alterations in original).) Respondents maintain that the decision of the Appellate Division reasonably applied established federal law and that habeas relief should be denied on this claim. (*See* DE 8, at 10–13.)

Petitioner essentially challenges the trial court's application of state law and it does not appear that his claim implicates any federal law or constitutional provision. (*See* DE 1-2, at 1–8.) To the extent Petitioner seeks only to challenge the jury instruction on state law grounds, his claim is not cognizable on habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991) ("[T]he fact that the [jury] instruction was allegedly incorrect under state law is not a basis for habeas relief."); *see also Hill v. Johnson*, No. 15-6835, 2018 WL 6649724, at *11 (D.N.J. Dec. 19, 2018).

To the extent Ground One may be construed to claim that the trial court's instruction on accomplice liability violated Petitioner's right to due process. it fails to state a claim for habeas relief. Federal habeas relief may only be granted based upon an error in a jury instruction where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). It is not enough to demonstrate that "the instruction is undesirable, erroneous, or even 'universally condemned,'" it must have violated a constitutional right. *Estelle*, 502 U.S. at 72 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

642 (1974)). Petitioner has failed to demonstrate that there was any error in the jury instructions, let alone that any such error denied him a fair trial. As the Appellate Division determined, the trial court did not err in instructing the jury separately on accomplice liability due to the complicated nature of the charges against Petitioner. Nor did the trial court fail to specify that the jury could find Petitioner guilty as an accomplice of a lesser-included offense. (*See* DE 8-32, at 40 ("If however you find the defendant not guilty of acting as an accomplice . . . on the specific crime charged, then you should consider whether the defendant did act as an accomplice, but with the purpose of promoting or facilitating the commission of some lesser offense than the actual crimes charged in the indictment.").) And, finally, there is no federal requirement that jury instructions be tailored to the facts of the case. *See Shelley v. Att'y Gen. for N.J.*, No. 18-2682. 2018 WL 2464503, at *2 (D.N.J. June 1, 2018) ("Although state law may very well require jury instructions to be tailored to the facts of a case under appropriate circumstances, there is no such requirement under federal law."). Accordingly, habeas relief on Ground One is denied.

**b. Ground Two**

In Ground Two, Petitioner claims that the trial court erroneously admitted testimony from Crawford that he saw Petitioner near his house approximately one week after the robbery and identified him as "the gunman who wore the wave cap." (DE 1-2, at 8.) Petitioner asserts that this testimony should not have been admitted because it was not corroborated by direct or circumstantial evidence and it therefore lacked "the indicia of reliability necessary to be considered a prior identification." (*Id.* at 13.) Respondents maintain that Petitioner is not entitled to relief on this claim because he challenges the admission of the testimony only on state law grounds and fails to demonstrate that the admission of this testimony deprived him of fundamental fairness. (DE 8, at 15–16.)

8

At trial, Crawford testified that about a week after the incident, he was sitting in his driveway when he saw Petitioner walking down the street. (DE 8-28, at 143–44.) Crawford told his mother, Rabb, that he thought he had seen Petitioner. (*Id.*) Crawford than dropped his mother off and, on his way back home, he again saw Petitioner walking down Second Street in Plainfield. (*Id.*) Crawford did not report this sighting to law enforcement until shortly before trial but was "very certain" he had seen Petitioner. (*Id.*) Rabb corroborated Crawford's testimony, explaining that Crawford was driving her somewhere when he said, "that's the guy that was in the house." (DE 8-29, at 37.) Rabb testified that she was upset that Crawford said this because "he was just obsessed with what happened and I wasn't sure if he was sure." (*Id.*) Rabb later testified that she did not recognize Petitioner at the time she and Crawford saw him on the street but was able to identify Petitioner in court as the man they saw. (*Id.* at 46.) Petitioner challenged the admission of this testimony on direct appeal. The Appellate Division determined that the out-of-court identification was properly admitted under the New Jersey Rules of Evidence, explaining:

> We find defendant's position to be incorrect. As he states in his brief, during her trial testimony, Rabb recounted Crawford's sighting, while in her company, of a person that he claimed was one of the intruders who had unlawfully entered the family's house a week earlier. And, in response to the prosecutor's questions, Rabb stated that she saw the person whom Crawford had identified in court, and that person was defendant. Accordingly, corroboration of Crawford's out-of-court identification clearly existed. That Rabb did not know the identity of the person identified by Crawford at the time of his identification is irrelevant.

(DE 8-8, at 10.)

While Petitioner challenges the admission of this testimony, he fails to identify any federal law or constitutional provision that was violated by the admission of this testimony. To the extent this claim may be construed as alleging a violation of Petitioner's right to due process, he is not entitled to relief. It is well-established that "the Due Process Clause does not permit the federal

9

courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983). Thus, the only question a habeas court may consider with respect to an evidentiary challenge is "whether the [challenged evidentiary decision] by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Admission of testimony regarding Crawford's sighting of Petitioner did not violate Petitioner's right to due process. As the Appellate Division determined, Crawford's testimony was not admitted in violation of New Jersey state law as it was reliable and corroborated by Rabb. Petitioner has not demonstrated that the admission of Crawford's testimony infected the trial in a way that his conviction violates due process. Accordingly, relief on this claim is denied.

### c. Ground Three

In Ground Three, Petitioner asserts that admission of out-of-court identifications made of Petitioner by Crawford and Bentley violated his right to a fair trial and due process because the identification procedure used was "impermissibly suggestive" and unreliable. (DE 1, at 14–15.) Petitioner contends that the identification was unduly suggestive because, prior to Crawford and Bentley viewing the photo array, police had Rabb identify jewelry that had been recovered by certain pawn shops as hers. (*Id.* at 14.) Petitioner argues that "[b]y disclosing that [police] had recovered the jewelry, [the officer] tainted the subsequent identification[s] that were made" because it sent a "subliminal message" that police had recovered a suspect and the suspect's photo was in the array. (*Id.*) Petitioner further challenges the reliability of the identification procedure because both Crawford and Brantley only briefly saw Petitioner's face during the robbery, "neither of the witnesses gave a detailed facial description of the gunman except to say that he had hair under his chin and more than two weeks passed between the crime and the identification procedure." (*Id.* at 15.) Respondents argue that Petitioner is not entitled to habeas relief on this

10

claim because he has failed to show any fault in the state court's application of the law nor demonstrated that the photo array procedure was suggestive in any way. (DE 8, at 18–22.)

Prior to trial, the trial court held a *Wade*[2] hearing to determine the admissibility of the out-of-court identifications Crawford and Brantley had made of Petitioner approximately two weeks after the robbery. Following the *Wade* hearing, the trial court issued a written opinion in which the judge determined that the identifications were admissible. (DE 8-5, at 11–19.) Applying the factors set forth in *Manson v. Braithwaite*, 432 U.S. 98 (1977), the trial court determined:

> It is true that Crawford admitted in his statement of July 31, 2006 that "[m]y girl said that he had a [little] bit of fuzzy hair underneath his chin." His very credible testimony at the *Wade* hearing established that Brantley was speaking of the suspect later identified as the defendant; the "third guy" of whom he spoke in his statement was the only man wearing a wave cap. Although he had conversations with his grandmother and others present during the crime, his discussion with Brantley was the only time Crawford discussed any of the perpetrators' descriptions. The discussion with others involved who they thought the perpetrators were.
>
> Crawford candidly admitted that he viewed the suspect for only 30 to 40 seconds during the three hour plus ordeal at his house. The rest of the time he looked down. It was not until the assailant aimed a gun at his 76 year old grandmother did he look up, concerned that she would be shot. During that 30 to 40 seconds, he saw the front of the perpetrator's face for half that time. Under the lights in the low ceiling of the basement, Crawford could see through the wave cap. The perpetrator's complexion was evident as was the lower portion of his face, including his chin, which was not covered by the makeshift mask. The suspect's light complexion was also evident from viewing his neck.
>
> During the other half of the 30-40 seconds, the perpetrator's back was to Crawford but Crawford could still see the back of his neck and the bottom of his jaw to his chin. Crawford thus had ample opportunity to view any facial hair on the perpetrator's chin.
>
> His testimony rang of truth. He admitted he saw nothing of the faces of the other two criminals because they were wearing ski masks.

---

[2] *United States v. Wade*, 388 U.S. 218, 239 (1967).

> And he pointedly said his identification was based on his own observations; not influenced by what Brantley told him. His description was not contradicted by the limited extent of his perception.
>
> One of the most important considerations in making this determination is the fact that all of the males pictured in the array shown to Crawford . . . had light facial hair on their chins. There is nothing suggestive about the array. Even without Crawford's own observations, Brantley's statement could not have led to Crawford picking one photo over another since the sole characteristic she identified was possessed by all those pictured.
>
> This court is clearly convinced that Crawford's identification was based on his observations of the assailant's complexion, facial hair and the features he observed through the translucent wave cap that only covered the gunman's eyes and mouth. There was no taint from Brantley's statement. Crawford had already seen the facial hair on the assailant's chin.
>
> The fact that Crawford was only "like 50 percent sure" . . . he selected a picture of the perpetrator goes to the reliability of the identification. To be sure, the defense has much to bring before the jury. The Photo Display Statement . . . memorializes Crawford's answer to [the detective's] question if he recognized anyone in the array as "being the person you saw in your home and put the gun in your mouth on 31 July 06?" Crawford respondent, "No, because I don't want to put the wrong guy in jail . . ." He also stated, "I can't be positive." Crawford's lack of certainty, the time period that he viewed his assailant, his degree of attention, the circumstances that existed and the other *Manson* factors are all considerations for the jury. They do not taint the identification so as to warrant exclusion because the procedure and Brantley's statement prior to the procedure were not suggestive.

(*Id.* at 17–19 (first alteration in original.) Petitioner challenged the identifications on direct appeal, where the Appellate Division held as follows:

> Defendant argues additionally that the fact that Crawford and Brantley were shown photo line-ups after Rabb had identified the jewelry retrieved from the pawn shops as hers "impermissibly tainted" their selection of defendant's photograph from the array. According to defendant, even if . . . the police officer who recovered the jewelry, did not explain how or where it had been recovered, "the mere fact that it was recovered sent a subliminal message to the

12

> victims that [the police officer] had a suspect and the suspect's photo
> was in the array." We find that argument to lack sufficient merit to
> warrant discussion in a written opinion.

(DE 8-8, at 11.)

The Supreme Court has instructed that admission of evidence of an out-of-court identification may violate a defendant's due process rights where "law enforcement officers use[d] an identification procedure that is *both* suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) (citing *Manson*, 432 U.S. at 107). An identification procedure may be deemed suggestive and unnecessary where it is based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). However, "[e]ven when an unnecessarily suggestive procedure was used, 'suppression of the resulting identification is not the inevitable consequence." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018). Instead, due process "requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* The key to that determination is whether the identification contains sufficient indicia of reliability. *Manson*, 432 U.S. at 106, 114. Factors to be considered in determining whether the identification was reliable "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* at 114.

The Court agrees with the Appellate Division that Petitioner's argument that the procedure utilized to obtain Crawford and Brantley's identifications was impermissibly suggestive lacks merit. Petitioner asserts that "the fact that Crawford and Brantley were shown the photo array after Rabb identified the jewelry as hers impermissible tainted [their] selection of Petitioner's

photograph." (DE 1-2, at 14.) However, the mere fact that a suspect may have been in a photo array is not unduly suggestive.

Moreover, Petitioner has failed to demonstrate that Crawford and Brantley's identifications were unreliable. Petitioner appears to argue that Crawford and Brantley's identifications were unreliable because they "had a limited opportunity to view the gunman because he was wearing a black wave cap over his face," preventing either from giving "a detailed facial description of the gunman except to say he had hair under his chin." (DE 1-1, at 15.) Petitioner further contends that the fact that two weeks had passed between the commission of the crime and the identification indicates it was unreliable. (*Id.*) The Court disagrees. As was determined by the trial court at the *Wade* hearing, while Crawford's opportunity to view Petitioner's face may have been limited, Crawford was able to observe Petitioner's face through the wave cap and, critically, "[t]he perpetrator's complex[ion] was evidence as was the lower portion of his face, including his chin, which was not covered by the makeshift mask." (DE 8-5, at 17.) And, though two weeks passed between the crime and the identification, such amount of time is not enough to have warranted exclusion of the identification.

Thus, because Petitioner has not demonstrated that the admission of the identification testimony violated his right to due process, relief on this claim is denied.

### d. Ground Four

Finally, Petitioner claims that the trial court's instructions to the jury on both in-court and out-of-court identifications were erroneous and misleading. (DE 1-2, at 15–19.) Specifically, Petitioner raises three issues with the instructions: (1) they were "improperly focused on factors that social science has revealed to be unreliable"; (2) they "failed to focus on factors that social science has revealed to be relevant to determining the reliability of an identification"; and (3) they

were "not adequately tailored to the facts of the Petitioner's case which violated the petitioner's rights to due process and a fair trial." (*Id.* at 16.) Petitioner additionally claims that the trial court failed to instruct the jury as to the "specific variables that had the potential to undermine the identifications made by Brantley and Crawford." (*Id.*) Respondents maintain that the trial court's instructions "conformed to the law and were not erroneous," and further that the Appellate Division's decision on this issue was not contrary to federal precedent. (DE 8, at 10–13.) The Appellate Division considered this claim on Petitioner's direct appeal and determined that "[t]he court's instructions in the present matter conformed to the law as it then existed, and therefore was not erroneous."[3] (DE 8-8, at 11.)

As noted, a petitioner may only be entitled to habeas relief on an error in the trial court's instructions to the jury where the alleged error "so infected the entire trial that the resulting conviction violates due process." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir. 2009) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Petitioner has failed to make this showing. The Court's review of the record reveals that the trial court's instruction on identification properly complied with *Manson*, 432 U.S. 98, the established federal law on identification, and New Jersey law at the time of trial.

Petitioner's other arguments as to why the jury instructions were erroneous are belied by the record. Petitioner first faults the trial court for not instructing the jury on "memory decay,"

---

[3] It appears from Petitioner's brief in support of his direct appeal that his arguments regarding the social science are based on *State v. Henderson*, 27 A.3d 872 (2011), in which the New Jersey Supreme Court revised the factors to be considered in determining the admissibility of an out-of-court identification at trial. As part of that decision, the Supreme Court requested that new jury instructions be drafted with respect to eyewitness identifications. *Id.* at 925–26. The Appellate Division determined that *Henderson* was not applicable to Petitioner's trial because *Henderson* was decided after Petitioner's trial and the New Jersey Supreme Court determined its decision applied only to future cases. *See id.* at 929; (*see also* DE 8-8, at 11).

15

based on the length of time (2 weeks) that passed between the crime and the out-of-court identifications. The trial court in fact did address this issue, though apparently not in the detail requested by Petitioner when it explained to the jury that it could "consider the length of time between the witness' observation of the offense . . . and the first identification." (DE 8-32, at 15.) Petitioner also faults the trial court for failing to instruct the jury that it could consider the suggestiveness of the out-of-court identification procedure employed by law enforcement. The trial court, however, did address this issue and instructed the jury that it could "consider the circumstances under which the out-of-court identification was made and whether or not it was the product of suggestive procedure, including everything that was done and said by law enforcement to the witnesses before, during or after the identification process." (DE 8-32, at 15.) Indeed, the trial court's charge on identification was well-tailored to the facts of the case—the trial court instructed the jury that it could consider the "effect, if any, the wearing of a mask would have upon a witness' ability to observe" and whether the type of mask worn would have presented any opportunity to view the perpetrator's face. (*Id.* at 15.)

For these reasons, the Court finds that the decision of the Appellate Division on this issue was neither contrary to federal precedent nor an unreasonable application of that law. Accordingly, habeas relief is denied on this claim.

## V. CERTIFICATE OF APPEALABILITY

A petitioner whose detention arises out of his state court conviction may not appeal from a final order in his habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement

to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, jurists of reason would not disagree with the Court's determination that Petitioner has not demonstrated a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability shall not issue.

## VI. CONCLUSION

For the reasons set forth above, the Petition is denied. A certificate of appealability shall not issue. An appropriate order follows.

s/ John Michael Vazquez<br>
JOHN MICHAEL VAZQUEZ<br>
United States District Judge

Date: 1/2/20